UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FOX KUHLKEN,<br><br>                                    Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, SAN DIEGO SHERIFFS DEPUTY D. SMITH (Id # 1024) and DOES 1-5,<br><br>                                    Defendants. | Case No.:  3:16-CV-2504-CAB-DHB<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 16]** |

On November 20, 2017, Defendants filed a motion for summary judgment or in the alternative partial summary judgment.  [Doc. Nos. 16 – 21.]  On December 12, 2017, Plaintiff filed an opposition.  [Doc. No. 25.]  On December 19, 2017, Defendants filed a reply to the opposition.  [Doc. No. 29.]  For the reasons set forth below, the motion for summary judgment is **GRANTED**.

I.      PROCEDURAL BACKGROUND

On October 6, 2016, Plaintiff filed the original complaint against Defendants. [Doc. No. 1.]  On October 8, 2016, Plaintiff filed a First Amended Complaint (FAC). [Doc. No. 3.]  The FAC contains the following causes of action:

1. Unreasonable Seizure (Detention/Arrest)(42 U.S.C. § 1983) against Deputy Smith;
2. Unreasonable Seizure (Excessive Force)(42 U.S.C. § 1983) against Deputy Smith;
3. Negligence under California Law against Deputy Smith and County of San Diego;
4. False Arrest under California law against Deputy Smith and County of San Diego;
5. Battery under California Law against Deputy Smith and County of San Diego; and
6. Violation of California Civil Code § 52.1 against Deputy Smith and County of San Diego.

[Doc. No. 3.]

## II. FACTUAL BACKGROUND

On Sunday, February 21, 2016, plaintiff Pamela Fox Kuhlken ("Fox") took her daughter to the Epic Volleyball Club, located at 13955 Stowe Drive, Poway, CA, for a tournament. She picked her up about 8:30 a.m. and about 8:55 a.m., dropped her off at the front door and went to look for a parking spot. [Doc. No. 25-10 (Fox Depo.), at 40:13-17, 52:25-53:25.] She pulled into a spot some distance from the entrance, intending to look for a closer one, preferably in the shade. [Id., at 53:4-10.]

After a few minutes Fox saw two spaces open up. She drove over and began slowly pulling into the one of them. [Id., at 57:1-3; 58:3-9.] She did not see any cars circling the lot looking for spaces. [Id., at 59:5-9.] Fox saw a man later identified as Cleon Platts sitting on a traffic island talking to a woman. [Id., at 59:12-18.]

As Fox pulled partway into the spot, Platts walked up from her right side and stepped in front of her car. [Id., at 67:5-18, 68:11-15.] Fox stopped, and made a motion for him to move. [Id., at 69: 24-21.] He remained in front of her car and his thighs, hips and waist were touching her car. [Id., at 70:25-71:25.]

She rolled down her driver's window to ask him to move. [Id., at 73:9-23.] He shook his head and sat down in front of her car, out of sight. [Id., at 74:14-22.] She heard kicking underneath her car. [Id., at 75:8-76:2.] She became scared and thought he might be staging an accident for some sort of insurance scam. [Id., at 76:3-11.]

A woman, later identified as Platts' wife, then arrived and started screaming "What are you doing? Are you trying to kill my husband? You're trying to run him over," and began taking pictures or video with her phone. [Id., at 77:18-78:7, 78:17-19.] Mrs. Platts also began kicking Fox's car. Fox then called 9-1-1. [Id., at 80:13-21.]

The call was logged as having been made at 9:15:22. [Doc. No. 24-4, Transcript of 9-1-1 call, at 1-3.] Fox provided the 9-1-1 operator a detailed description of the events, gave her name and telephone number, the other party's license plate, stated she was going to move to another parking spot and agreed to stay separated from Platts until the deputies arrived. [Id.]

Deputy Sheriff Darin Smith was dispatched by an emergency operator to respond to an argument over a parking space. [Doc. No. 25-14 (Smith Depo.), at 21:14-22.] While en route, a second caller to 9-1-1 (Mrs. Platts) reported that one of the involved parties, a female in a red car, used her car to run over the other person. [Doc. No. 25-7, at 1-4; Doc. No. 25-14, at 21:25-22:21; Doc. No. 17, Ex. A (Smith Decl.), ¶ 3.] Consequently, Deputy Smith understood he needed to investigate not only an argument, but a possible assault with a deadly weapon. [Id.]

Deputy Smith was the first law enforcement officer to arrive on scene. [Id., ¶ 4.] When he pulled into the Epic parking lot, he saw people standing around and Platts sitting on the curb. [Id.] Deputy Smith parked his patrol SUV in the aisle near where Platts was sitting. [Id.] He exited his vehicle and began speaking to Platts. Platts reported that a woman ran over his foot and had driven away. Deputy Smith's conversation with Platts only lasted about 15 to 20 seconds when Fox arrived. Platts identified her as the lady involved in the dispute. [Id.]

The following is Fox's description of the subsequent events. Upon approaching Deputy Smith, Fox informed him that she had called 9-1-1 and wanted to know if he was there in response to her call. Deputy Smith dismissively responded that it was all one situation, and demanded her identification. [Doc. No. 25-10, at 107:15-16, 111:19-25, 113:1-114:1, 117:12-19.]

Deputy Smith's tone was aggressive and frightening when he demanded her identification, and, taken aback, Fox responded "Excuse me?" Deputy Smith then threatened her saying "Do you want to be tased?" She responded that she called for help and he couldn't tase her. [Doc. No. 25-10, at 115:20-25, 121:1-14.]

Fox testified that Deputy Smith then demanded she give him her purse and grabbed for it. [Id., at 124:1-24.] She resisted his attempt to take her purse. [Id., at 125:9-17.] Then Deputy Smith put her arms behind her back and handcuffed Fox. [Id., at 127:24-25.] Fox testified that Deputy Smith then left her standing alone facing his patrol car and went to speak with Platts about five to six feet away. [Id., at 142:5-22, 143:23-144:2.]

Fox testified at that point the cuff slipped off her right hand. She turned around to face Deputy Smith, raised both hands to show Deputy Smith that the handcuff had slid off her right hand and said, "Excuse me," to get his attention. [Id., at 132:7-15, 139:10-23, 143:6-8.] She testified that in response Deputy Smith came back to her, pulled her arms behind her, put his leg around her leg and threw her to the asphalt. [Id., at 144:15-20.]

She contacted the ground with her head and shoulders, scraping her right front shoulder, and hitting the top of her head causing two hair clips to break leaving cuts and scrapes on her scalp. [Id., at 145:12-146:22, 147:5-25.] Deputy Smith then recuffed Fox tightly, and with the assistance of another man, off-duty City of Riverside police officer Sgt. Shank,[1] lifted her to her feet and took her to the back of Deputy Smith's patrol vehicle. [Id., at 148:1-17.] Fox resisted being placed into the vehicle. [Id., at 152:2-22.] With the assistance of Sgt. Shank, Deputy Smith placed Fox in his patrol vehicle and Fox was transported to the Poway Sheriff's Station.

The following is Deputy Smith's description of the events starting at his interaction with Fox. As she approached, Fox demanded to know if Deputy Smith was

---

[1] Doc. No. 17, Ex. A, ¶7.

there in response to her call. He responded, yes, saying it is all one situation and asked for her identification. [Doc. No. 17, Ex. A, ¶ 5.] Fox did not provide her identification, and became defensive and questioned why it was necessary. [Id.] Deputy Smith, who had still not fully assessed the situation, warned Fox that she would be detained if she did not provide her identification and she would need to take a seat in his patrol vehicle until another deputy arrived. [Id.]

Fox still did not provide her identification, so Deputy Smith then tried to compel compliance by telling Plaintiff that she may be tased if she did not provide her identification. [Id.] Fox still refused to comply. [Id.] To secure the scene, Deputy Smith decided to place Fox in the back of his patrol vehicle until help arrived. [Id., ¶ 6.] Deputy Smith went to grab Fox by the arm to guide her to the left rear door of his patrol SUV. [Id.] Fox actively and physically resisted Deputy Smith's efforts to move her towards the vehicle. [Id.] Deputy Smith instructed Fox to put down her purse and have a seat in the patrol vehicle. [Id.]

Fox continued to refuse and resist so Deputy Smith turned her back around and grabbed hold of both her wrists behind her back. [Id.] Deputy Smith temporarily let go of her right wrist to use his radio to determine the status of the other deputy en route. [Id.; Doc. No. 17, Ex. C (Peterson Decl.), ¶ 3.] Fox took that opportunity to try to spin and face Deputy Smith again. [Doc. No. 17, Ex. A, ¶ 6.] She physically resisted Deputy Smith's efforts to regain control of her right wrist. [Id.]

Because of her aggressive physical resistance, Deputy Smith used a take-down maneuver to put Fox on the ground and apply handcuffs. [Doc. No. 25-14, at 47:2-48:14; Doc. No. 17, Ex. A ¶6.] Deputy Smith stated he did the maneuver slower than usual to minimize the impact to Fox. [Id.] Once on the ground, Fox however continued to struggle. [Id., ¶7; Doc. No. 17, Ex. E (Incident Video[2])].

---

[2] A bystander, Jean Bralich, recorded part of the incident on a cell phone. [Doc. No. 17, Ex. E.] Deputy Smith secured a copy. [Doc. No. 17, Ex. A, ¶ 8.] The video is approximately two and half minutes long

An off-duty City of Riverside police officer ("Sgt. Shank") offered to assist Deputy Smith. Together Deputy Smith and Sgt. Shank were able to handcuff Fox and raise her to her feet. Deputy Smith went to adjust the handcuffs when Fox pulled her left arm free. Fox continued to aggressively physically and verbally resist as Deputy Smith and Sgt. Shank tried to get her left wrist back in the handcuffs. They were able to force Fox back into handcuffs and into the back door of the SUV. [Doc. No. 17, Ex. A, ¶7; Doc. No. 17, Ex. E.]

While putting her in the back of the patrol SUV, Fox braced her legs and leaned in the opposite direction they were trying to move her. Deputy Smith used his body weight to force her into the vehicle. Once seated, Fox was facing out with her legs hanging out the open door. She hooked her feet around Deputy Smith's legs and the bottom edge of the open door to prevent him from closing the door. Sgt. Shank entered the back seat from the other rear door and pulled Fox toward him as Deputy Smith moved her legs inside the floorboard with his hands. Deputy Smith and Sgt. Shank were able to close both rear doors at this point. [Doc. No. 17, Ex. A, ¶7; Doc. No. 17, Ex. E.]

Deputy Smith placed Fox under arrest for resisting a peace officer in violation of Penal Code section 148(a)(1). [Doc. No. 17, Ex. A, ¶9.] Deputy Smith transported Fox to the Poway Sheriff's Station. [Id.]

While at the station, Fox refused any medical attention. [Id., ¶ 10; Doc. No. 17, Ex. B (Boegler Decl.), ¶¶ 5, 7; Doc. No. 17, Ex. D (Intake Audio Recording).] She was asked and denied having any medical needs at the time. [Doc. No. 17, Ex. A, ¶ 10; Doc. No. 17, Ex. B, ¶¶ 5, 7; Doc. No. 17, Ex. D.] Other than pain to her wrists while handcuffed, she did not complain about pain to anybody during her interaction with law enforcement that day. [Doc. No. 21, Ex. I (Fox Depo,), at 171:1-172:9; Doc. No. 17, Ex. A, ¶ 10; Doc. No. 17, Ex. B, ¶ 7; Doc. No. 17, Ex. D.] The only visible injury was a small abrasion to her

and it starts from when Sgt. Shank and Deputy Smith are struggling with Fox on the ground and ends shortly after they place Fox in the patrol SUV and close the doors.

left hand. [Doc. No. 17, Ex. A, ¶ 9; Doc. No. 17, Ex. G (Eight Photos of Fox).] Deputy Smith sustained a scratch to his left hand. [Doc. No. 17, Ex. A, ¶ 9; Doc. No. 17, Ex. H (Three Photos of Deputy Smith's Hand).]

Fox was cited for violation of Penal Code section 148(a)(1) and released. [Doc. No. 21, Ex. I, at 173:15-17; Doc. No. 17, Ex. A, ¶ 10.] As a courtesy, Deputy Smith drove her back to Epic and arrived there shortly after noon. [Doc. No. 21, Ex. I, at 176:15-177:25; Doc. No. 17, Ex. A, ¶ 10.) Fox made no complaint with the way she was treated at the station. [Doc. No. 21, Ex. I, at 169:11-25.]

III.    UNDISPUTED FACTS

While the parties present different accounts of the interaction between Fox and Deputy Smith, there are certain facts that are undisputed and material. The undisputed evidence shows that Deputy Smith was responding to, at a minimum, an incident involving a vehicle and, potentially, to an assault with a deadly weapon. [Doc. No. 25-14, at 21:14-22:21; Doc. No. 17, Ex. A, ¶ 3.] When Deputy Smith arrived at the scene, he had a brief discussion with Platts. [Id., ¶ 4.] Fox then arrived at the scene and Platts identified her as the person who allegedly ran over his foot with her car. [Id.; Doc. No. 25-10, at 110:14-19.] Therefore, it is undisputed that Deputy Smith had the right to detain Fox and ask for her identification.

It is also undisputed that Fox failed to provide identification when Deputy Smith requested it. Instead, Fox questioned the need for the request. [Id., at 121:1-4; Doc. No. 17, Ex. A, ¶5.] Deputy Smith then warned Fox he would use physical force if she did not provide identification.[3] Fox still did not comply. [Doc. No. 17, Ex. A, ¶5.]

---

[3] Deputy Smith states he first warned Fox that she would be detained if she did not provide identification. [Doc. No. 17, Ex. A, ¶5.] He then warned her she might be be tased if she did not comply. [Id.] Fox testified Deputy Smith immediately threatened to tase her. [Doc. No. 25-10, at 121:1-14.] Nevertheless, it is undisputed that Deputy Smith warned Fox he would use physical force if she did not provide identification.

Finally, it is undisputed that, at numerous times, Fox resisted being detained. [Doc. No. 17, Ex. A, ¶¶ 6, 7.] Most of that resistance is captured on video. [Doc. No. 17, Ex. E.] Fox acknowledged that she purposely resisted Deputy Smith's initial attempt to move her to the patrol SUV:

> Q. So it's your testimony that as soon as Deputy Smith put his hands on your arm to guide you towards the car, you remained motionless?
> A. I remained actively passively resisting. I just wanted to hold my person in tact. I had no idea why there was any need to touch me.
> Q. You used the word "actively passively resisting." What does that mean? Is that active or is it passive?
> A. I think a passive resistance would be going with the way you were treated. And I was just trying to hold my ground and keep my person in tact and safe and unmolested.
> Q. So Deputy Smith was trying to move you to your car, and you were trying to stay where you were.
> Is that an accurate statement?
> A. Yes.
> Q. And by you not – strike that.
> By you resisting, whether it's active or passive, in Deputy Smith's attempt to move you, did you feel that he had to use greater strength to get you to move?
> A. Yes.

[Doc. No. 25-10, at 133:2-24.]

Fox also acknowledged that she resisted Deputy Smith's efforts to take her purse after she refused to hand it to him:

> Q. All right. So he goes to grab – does he grab the purse strap or the purse itself?
> A. The purse itself.
> Q. And do you resist?
> A. I held onto my purse.
> Q. So, yes, you resisted him grabbing your purse?
> A. I – yes. I held onto my purse.

[Id., at 125:9-15.]

> Q. And did you still have your purse and your lunch box on your right shoulder?
> A. No. He had pried those off. He had taken those.
> Q. Did you resist that part of the process as well?

A. I tried to hold onto my purse. I didn't know what was going on. I did not understand why any of this was necessary. And that was my property. I didn't understand what was going on. That's what I kept asking him: "Why are you doing this? Why are you treating me like this?"

[Id., at 140:5-16.][4] Although Fox testified she had no recollection of resisting being handcuffed or why Deputy Smith needed assistance to get her to her feet [id., at 148:1-149:20], she admitted that she resisted Deputy Smith's efforts to put her into the patrol SUV:

Q. Ma'am, you've seen the video, right?
A. I saw the video.
Q. And you can see in the video that you're not allowing yourself to be put in to the car, correct?
A. Yes.

[Id., 152: 18-22.]

## DISCUSSION

A. Legal Standard.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to show there is a genuine issue for trial. Id. at 331.

---

[4] At this point, Fox testified that Deputy Smith pulled her arms behind her, handcuffed her, and then he walked away. One of the handcuffs simply dropped off because it was too loose, so she showed Deputy Smith her arm with no handcuff. In response, Deputy Smith then threw her to the asphalt and recuffed her. [Doc. No. 25-10, at 127:24-25, 132:7-15, 139:10-23, 143:22-144:16.] Deputy Smith states that when Fox refused to put down her purse and move to his patrol vehicle, he took hold of her wrists behind her back and when she continued to struggle he employed a takedown maneuver and applied handcuffs. She continued to resist the cuffs and being placed in his patrol vehicle. [Doc. No. 17, Ex. A, ¶¶ 6, 7.] The video shows Fox physically and verbally resisting while on the ground, Deputy Smith taking out his handcuffs to restrain her, and Fox then resisting being cuffed and fighting being placed in the patrol vehicle. [Doc. No. 17, Ex. E.]

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.2000). The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

B. Unreasonable Seizure (Detention/Arrest)(42 U.S.C. § 1983) against Deputy Smith.

    1. Unlawful detention.

Plaintiff has abandoned her claim that Deputy Smith unlawfully detained her at the scene. [Doc. No. 25 at 22-23.] Moreover, the undisputed facts demonstrate that Deputy Smith had the right to detain Plaintiff and ask for her identification. Deputy Smith had reasonable suspicion that Fox may have been involved in criminal activity (a possible assault), and could detain her to investigate her involvement.

    2. Unlawful arrest.

Defendants argue Deputy Smith had probable cause to arrest Plaintiff for her failure to provide identification and for delaying, obstructing, and resisting Deputy Smith. [Doc. No. 16-1 at 12-15.] Plaintiff argues the arrest was unjustified. [Doc. No. 25 at 25-28.]

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (*quoting Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001)). "Probable cause exists when there is a fair probability or substantial chance of criminal activity." *Id.* (*quoting United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004)) (*quoting in turn United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)) (internal quotation omitted in *Lacey*) (emphasis added). "It is well-settled that 'the determination of probable cause is based

upon the totality of the circumstances known to the officers at the time of the search.' " *Id.* (*quoting Bishop*, 264 F.3d at 924).

"Probable cause exists when police have knowledge at the moment of arrest of facts and circumstances based on reasonably trustworthy information that would warrant a belief by a reasonably prudent person that the person arrested has committed a criminal offense." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002) (*citing Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999)). "In general, we must ask whether 'a prudent person would believe [that Plaintiff] had committed a crime.' " *Lacey*, 693 F.3d at 918 (*quoting Dubner*, 266 F.3d at 966). "The evidence need support 'only the probability, and not a prima facie showing, of criminal activity,' *Illinois v. Gates*, 462 U.S. 213, 235 (1983), and such evidence need not be admissible, but only legally sufficient and reliable. *Franks v. Delaware*, 438 U.S. 154, 165 (1978)." *Franklin*, 312 F.3d at 438 (parallel citations omitted).

The undisputed facts show Deputy Smith had probable cause to arrest Plaintiff for failure to provide identification (Cal. Vehicle Code §12951) and for delaying, obstructing, and resisting Deputy Smith in the discharge of his duties (Cal. Penal Code §148(a)(1)). Deputy Smith was dispatched by an emergency operator to respond to an argument over a parking space. While en route, a second caller reported that one of the involved parties, a female in a red car, used her car to run over the other person. Thus, at a minimum, Deputy Smith was responding to an accident involving a vehicle, and potentially to an assault with a deadly weapon.

Deputy Smith was the first law enforcement officer to arrive on the scene. When he pulled into the parking lot, he saw people standing around and Platts sitting on the curb. Deputy Smith spoke to Platts, who reported that Plaintiff had run over his foot, and identified Plaintiff as the lady involved in the dispute. Thus, when Deputy Smith asked Plaintiff for her identification, she was legally obligated to provide it to him, *see* Cal. Veh. Code §12951, and her failure to do so was a violation of the law.

Plaintiff knew she was involved in a vehicular incident with Platts, but she asserts she did not know him to be injured as a result, and therefore had no duty under Cal. Veh. Code §§20001, 20003 to provide her identification to Deputy Smith.  Consequently she contends her non-compliance could not be the basis of an arrest.

The undisputed facts are that Plaintiff, the driver of a vehicle, knew she was involved in a vehicle-related incident with Platts and Deputy Smith was investigating the incident.  She was obligated to provide her identification upon the officer's request under Cal Veh. Code §12951(b), regardless of whether she believed Platts was at fault, or uninjured.   The facts are undisputed that Plaintiff failed to provide identification when Deputy Smith requested it.  Instead, Plaintiff questioned the need for the request and impeded his investigation.  Smith warned Plaintiff he might use force if she did not comply.  Still, Plaintiff did not comply.

Plaintiff argues that her refusal to provide identification was not willful, but that she was merely attempting to ask Deputy Smith about his purpose.  [Doc. No. 25 at 28.] However, Plaintiff's failure to understand why the identification was needed does not negate the fact that she was legally obligated to provide it.[5]  Plaintiff also suggests that she was not given an opportunity to provide her identification because everything

---

[5] Plaintiff argues that she did not know why Deputy Smith was asking for her identification, when she was the one who had called 9-1-1, and she had identified herself to the 9-1-1 dispatcher.  However, regardless of what information Deputy Smith was given by dispatch, he had a legal obligation to investigate Plaintiff's claim as well as Platts' claim.  The Ninth Circuit "has held that '[i]n establishing probable cause, officers may not solely rely on the claim of a citizen witness that [s]he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses.' " *Hopkins v. Bonvicino*, 573 F.3d 752, 767 (9th Cir. 2009) (*quoting Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001)) (*citing in turn Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991) ("[P]olice officers ha[ve] a duty to conduct an investigation into ... [a] witness'[s] report....")).  This is true even where the arresting officer has learned information from other law-enforcement officials. *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1293 n. 16 (9th Cir. 1999) ("Although a police officer is entitled to rely on information obtained from fellow law enforcement officers, this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts.") (citation omitted).  Therefore, Plaintiff's claim that she was the victim in the incident and had already identified herself to dispatch is not a justification for her failure to provide identification, as Deputy Smith had an obligation to investigate her claims as well as the claims of Platts.

escalated so quickly.  [Doc. No. 25 at 28.]  However, the undisputed evidence is that when Deputy Smith asked her for identification, Plaintiff questioned why he needed her identification. Deputy Smith warned Plaintiff she would be physically restrained if she did not provide it, and she was still not forthcoming – all before he attempted to physically restrain her.  Moreover there is no evidence that, during this time, Plaintiff ever provided her identification or tried to provide her identification.  Therefore, there is no dispute that Plaintiff failed to provide her identification.

The facts are also undisputed that Plaintiff physically resisted being detained.  A good portion of that resistance is captured on video.  Moreover, Plaintiff admitted that she actively resisted Deputy Smith's efforts to restrain her or put her in the back of the patrol SUV.  Therefore, there is no dispute that Plaintiff resisted being detained.

Deputy Smith had probable cause to believe Plaintiff was violating the law. "The evidence need support 'only the probability, and not a prima facie showing, of criminal activity....' " *Franklin*, 312 F.3d at 438 (*quoting Illinois v. Gates*, 462 U.S. at 235) (emphasis added); *accord, e.g., Chism v. Washington State*, 661 F.3d 380, 389 (9th Cir. 2011).  Here, Deputy Smith personally observed Plaintiff fail to provide her identification and physically resist his efforts to restrain her.  Moreover, Deputy Smith had knowledge that Plaintiff had been involved in an incident where the other party was accusing her of running over his foot with her car.  Because of Plaintiff's behavior, Deputy Smith was prevented from investigating the veracity of the other party's claims.  However, the facts available to Deputy Smith at the time showed a fair probability that Plaintiff had violated Vehicle Code sections 12951, 20001, 20003 and Penal Code section 148.  Therefore, the Court finds as a matter of law that Deputy Smith had probable cause to make an arrest, and there was no Fourth Amendment violation.

### 3.  Qualified Immunity.

Even if there is a triable issue as to whether there was a Fourth Amendment violation, and whether Deputy Smith lacked probable cause to arrest Plaintiff, Deputy Smith is immune from the unlawful arrest claim as a matter of law.  "The doctrine of

qualified immunity assumes that police officers do not knowingly violate the law." *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). "An officer thus is presumed to be immune from any damages caused by his constitutional violation." *Id.* "Qualified immunity shields public officials from civil damages for performance of discretionary functions." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009). "It is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " *Id.* (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original). Qualified immunity protects an officer from suit "when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.' " *Mueller*, 576 F.3d at 992 (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Mueller*, 576 F.3d at 992 (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The standard is an objective one that leaves 'ample room for mistaken judgments.' " *Mueller*, 576 F.3d at 992 (*quoting Malley*, 475 U.S. at 343). The Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

To determine whether Deputy Smith is immune from suit, the court must consider "whether the official's conduct violated a constitutional right, and if so, whether that right was clearly established at the time of the event in question." *Mueller,* 576 F.3d at 993 (*citing Saucier v. Katz*, 533 U.S. 194, 206 (2001)); *accord, e.g., Pearson v. Callahan*, 555 U.S. 223, 232 (2009). It is not "mandatory" to address these two prongs in this order. *Pearson*, 555 U.S. at 232–36. Courts are to "exercise their sound discretion in deciding which prong ... should be addressed first in light of the particular circumstances of the case at hand." *Id*. at 236; *accord Mueller*, 576 F.3d at 993–94. The court reads disputed facts in the light most favorable to Plaintiff. *See, e.g., Mueller*, 576 F.3d at 982, 994; *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("Where [material factual] disputes exist, summary judgment is appropriate only if Defendants are entitled

14

to qualified immunity on the facts as alleged by the nonmoving party.") (*citing Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).

For present purposes, assuming that there was an unlawful arrest, the court must then proceed to the second, "clearly established" prong of the qualified-immunity test. *Cf. Mueller*, 576 F.3d at 994 (finding a jury question on constitutional violation and skipping to "clearly established" issue). "The dispositive question in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Put differently, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092–93 (9th Cir. 2013) (*quoting Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Mueller*, 576 F.3d at 994 (*quoting Saucier*, 533 U.S. at 201); *accord, e.g., Deorle v. Rutherford*, 272 F.3d 1272, 1278–79 (9th Cir. 2001) ("[T]he court must ... determine whether the right violated was clearly established in a 'particularized ... sense....' ").

Plaintiff does not cite to any particular case that clearly establishes that Deputy Smith's alleged conduct was unlawful.[6] Rather, Plaintiff merely argues, without citation, that it has long been settled that a warrantless arrest requires probable cause. [Doc. No. 25 at 35.] This is obviously true, but it misses the point. The "clearly established" inquiry cannot be resolved with so broad a stroke. This is true especially in light of the recent decision in *White v. Pauly*, 137 S. Ct. 548 (2017). The Court there drove home the "longstanding principle" that, in analyzing qualified immunity, " 'clearly established law' should not be defined 'at a high level of generality.' " *Id*. at 552 (*quoting Ashcroft v. al-*

---

[6] It is the plaintiff who bears the burden of showing that the rights allegedly violated were "clearly established." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)(citations omitted).

*Kidd*, 563 U.S. 731, 742 (2011)). If the courts deal too abstractly in this area, *White* explained, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id*. (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Even reading the factual record in the light most favorable to Plaintiff with regard to the unlawful arrest claim, Deputy Smith's conduct was not so obviously outside the constitutional pale that only the "plainly incompetent or those who knowingly violate the law" would have done the same. *See Mueller*, 576 F.3d at 992 (*quoting Malley*, 475 U.S. at 341). Therefore, Deputy Smith is entitled to qualified immunity for the unlawful arrest claim.

C. Unreasonable Seizure (Excessive Force)(42 U.S.C. § 1983) against Deputy Smith.

Defendant argues the use of force to effect Plaintiff's arrest was reasonable under the circumstances and therefore did not violate the Fourth Amendment. [Doc. No. 16-1 at 22-25.] Defendant further argues that, even if the use of force was excessive, Deputy Smith is entitled to qualified immunity. [Doc. No. 16-1 at 25-26.] Plaintiff argues there are disputed facts as to whether the force used was reasonable [Doc. No. 25 at 18-22], and qualified immunity is not warranted [Doc. No. 25 at 22-27.]

1. Excessive Force.

The constitutional right at issue when it is alleged that a law enforcement officer used excessive force in the course of an arrest or other seizure is the Fourth Amendment right to be free from "unreasonable... seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful

attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The most important Graham factor is the immediacy of the threat posed to the safety of the officers or others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). Courts also consider the "quantum of force used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (citations omitted). The reasonableness inquiry in excessive force cases is an objective one, meaning that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

        a.    Severity of the Crime at Issue.

When Deputy Smith responded to the scene, it was his understanding that Platts had accused Plaintiff of running over his foot with her car. Thus Deputy Smith was responding to the scene of a potential assault with a deadly weapon. This is a serious crime and weighs against a finding of excessive force. *Radwan v. City of Orange*, No. SACV 08-0786AG, 2010 WL 3293354, at *17 (C.D. Aug. 18, 2010), *aff'd*, 519 F.App'x 490 (9th Cir. 2013), *citing Bryan v. MacPherson*, 608 F.3d 614, 625 (9th Cir. 2010).

        b.    Immediacy of Threat.

The "most important" *Graham* factor is whether the person "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). Because of the proximity of Platts and other onlookers, Deputy Smith feared that Plaintiff's demeanor could reignite the confrontation with Platts. That presented a significant safety risk to Platts, Plaintiff, the onlookers and Deputy Smith. In addition, Deputy Smith was the only officer on scene and had yet to speak to anyone other than the 15 second exchange with Platts. Because of Plaintiff's failure to provide identification, and her forceful and continued resistance, Deputy Smith feared for his safety and the

safety of others present. Under these circumstances, it was reasonable for Deputy Smith to believe that Plaintiff posed an immediate safety risk.

### c. Active Resistance.

It is undisputed that Plaintiff failed to provide identification and actively resisted being detained and arrested. A good portion of that resistance is captured on video and cannot be disputed. Moreover, Plaintiff repeatedly confirmed that she resisted Deputy Smith's efforts to restrain her or put her in the back of the patrol SUV. Thus, the use of force by Deputy Smith started out as minor, only escalated as Plaintiff continued to resist attempts to detain and restrain her, and was not out of line with the resistance Plaintiff offered. *See Arpin v. Santa Clara Valley Trnsp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)(use of force necessary to put handcuffs on arrestee who stiffened her arm and attempted to pull free to avoid handcuffing was not excessive).

### d. Quantum of Force.

As discussed above, the quantum of force started out as minor, and only escalated as Plaintiff continued to resist attempts to detain and restrain her. Thus, the quantum of force used was not unreasonable.

### e. Alternative Methods.

Here, Deputy Smith attempted multiple methods of getting Plaintiff to comply before finally being able to restrain her and put her in the patrol SUV. After Plaintiff failed to provide her identification, Deputy Smith warned her that she would have to sit in the back of the patrol SUV if she did not comply and/or that she may be tased if she failed to comply. He tried to grab her by the arm and guide her into the patrol SUV. He took her to the ground, causing no identifiable injury. Because of her active resistance, Deputy Smith accepted the assistance of an off-duty officer to help restrain Plaintiff. Deputy Smith applied the handcuffs. After Plaintiff slipped out of her handcuffs, Deputy Smith had to tighten them. Therefore, alternative methods were explored and reasonably attempted.

1         **f.**   Plaintiff's Mental and Emotional State.

2         Plaintiff does not argue that she had any particular mental illness.  Therefore, this

3    is not a factor to be addressed.

4         **g.**   Warnings.

5         Providing warnings is a factor to consider when conducting a *Graham* analysis.

6    *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).  Here, after Plaintiff refused

7    to provide her identification, Deputy Smith warned her that she would have to sit in the

8    back of the patrol car and might be tased if she did not comply.  After Plaintiff continued

9    to resist, Deputy Smith elected to take Plaintiff to the ground and handcuff her instead of

10    tasing her.  Nevertheless, Deputy Smith warned Plaintiff that he would use force against

11    her if she did not comply.

12         **h.**   Conclusion.

13         After balancing the foregoing *Graham* factors and "[a]llow[ing] for the fact that

14    police officers are often forced to make split-second judgments—in circumstances that

15    are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in

16    a particular situation," *Graham*, 490 U.S. at 397, the Court concludes as a matter of law

17    that Deputy Smith did not use excessive force. No reasonable jury could find that Deputy

18    Smith applied an excessive amount of force during the arrest of Plaintiff. *See, e.g., Miller*

19    *v. Clark County*, 340 F.3d 959, 963-68 (9th Cir. 2003) (use of trained police dog to "bite

20    and hold" suspect until officers arrived on the scene less than a minute later does not

21    constitute unreasonable excessive force under 4th Amendment when suspect poses

22    immediate threat to officers' safety, several attempts to arrest suspect with less forceful

23    means are unsuccessful as a result of suspect's defiance, and use of police dog is well-

24    suited to task of safely arresting suspect).

25         **2.**   Qualified Immunity.

26         Even if there is a triable issue as to whether there was a Fourth Amendment

27    violation, and whether Deputy Smith used excessive force in arresting Plaintiff, Deputy

28    Smith is immune from the excessive force claim as a matter of law.

Plaintiff argues that it is clearly established that the way handcuffs were applied constitutes excessive force. [Doc. No. 25 at 36.] Plaintiff also argues that it is clearly established that "gang tackling can be actionable." [7] [Doc. No. 25 at 37.] However, none of the cases cited by Plaintiff meet the "exacting standard" required by the U.S. Supreme Court to provide Deputy Smith with "clear notice" that using the amount of force he used was unlawful. *S.B. v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017), *citing White*, 137 S.Ct. at 551. While "no two cases are exactly alike" and the Court is not required to find a case "directly on point," Plaintiff has not provided any precedent particularized to the facts of this case that would have put Deputy Smith on notice that his conduct was unconstitutional. *Hughes v. Kisela*, 862 F.3d 775, 786-787 (9th Cir. 2016), as amended (June 27, 2017) (internal citations omitted).

For example, none of the cases cited by Plaintiff regarding handcuffing[8] involve a suspect that was accused of running over someone with her car, refused to provide identification, physically resisted being detained and slipped out of her handcuffs when they were first applied. In addition, none of the "gang tackling" cases cited by Plaintiff are applicable, as neither Deputy Smith nor the off-duty officer punched, struck, tackled, or used hobbled restraints on Plaintiff. Moreover, Plaintiff's attempts to distinguish *Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) are unpersuasive. In *Shafer*, the Ninth Circuit held that an officer was entitled to qualified immunity where the officer "progressively increases his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders and resists, obstructs, or delays the officer in his lawful performance of duties such that the officer has probable cause to arrest him in a challenging

---

[7] This is not an accurate characterization of the facts in this case.
[8] A suspect can be painfully handcuffed under certain circumstances. *Strem v. County of San Diego*, 2017 WL 4861985, at *6 (S.D. Cal. Oct. 25, 2017).

environment." 868 F.3d at 1117. The situation here is essentially the same. Therefore, Deputy Smith is entitled to qualified immunity for the excessive force claim.

D. State Law Claims.

In her third through sixth claims, Plaintiff alleges Deputy Smith was negligent in the manner in which he effected the arrest, made a false arrest, and the amount of force he used was excessive and constituted a battery. Plaintiff claims she sustained injuries and damages as a result of Deputy Smith's conduct.

All of the state law claims depend on whether Deputy Smith acted reasonably and with reasonable force. To prevail on a claim for negligence, "Plaintiffs must show that the Defendant officers acted unreasonably and that the unreasonable behavior harmed Plaintiffs." *Robinson v. City of S.D.*, 954 F. Supp. 2d 1010, 1027 (S.D. Cal. 2013) (citation omitted). The Fourth Amendment reasonableness standard applies to claims of unlawful arrest (*Robinson*, 954 F.Supp.2d at 1027) and to claims that officers were negligent in using excessive force. *See Young*, 655 F.3d at 1170 (*citing Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1108–09 (Cal. Ct. App. 2004)). Similarly, to prevail on a claim for battery, a plaintiff must show "an officer used unreasonable force against him to make a lawful arrest or detention." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001). A state law battery claim is the equivalent of a federal claim of excessive force. *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (Cal. Ct. App. 2009). For the reasons set forth above, the undisputed facts show that Deputy Smith acted reasonably, had probable cause to arrest, and did not use excessive force. Therefore, Defendants'[9] motion for summary adjudication of the state law claims is **GRANTED**.[10]

_____

[9] Plaintiff agrees that, as to the state law claims, the County can only be found liable if Deputy Smith is found liable. [Doc. No. 25 at 41.]

[10] The Court does not reach the issue of whether the state law privileges apply. Given that there are no viable claims, the Court does not reach the issue of punitive damages.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED.** Judgment shall be entered in favor of Defendants and the Clerk of the Court shall **CLOSE** the case.

**IT IS SO ORDERED**.

Dated:  January 16, 2018

_____
Hon. Cathy Ann Bencivengo
United States District Judge